# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNIVERSAL FOREST PRODUCTS
EASTERN DIVISION, INC.,

        Plaintiff,

     v.                             Case No. 06-C-0698

MORRIS FOREST PRODUCTS, LLC,

        Defendant.

---

## DECISION AND ORDER

---

### I.  PROCEDURAL  AND FACTUAL BACKGROUND

This action was commenced on June 15, 2006, when the plaintiff, Universal Forest Products Eastern Division, Inc. ("Universal"), filed its original complaint against the defendant, Morris Forest Products, LLC ("Morris").  Universal asserts two counts against the defendants: (1) equitable subrogation/breach of contract; and (2) unjust enrichment.  Universal filed its First Amended Complaint on October 11, 2006, adding additional paragraphs to its pleadings under the unjust enrichment count.

On September 5, 2006, the defendant filed a motion to dismiss Counts One and Two pursuant to Fed. R. Civ. P. 12(b)(6).  On November 30, 2006, the court denied the defendant's motion to dismiss.

Currently pending before the court is the defendant's motion for summary judgment which is fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment contained responses to the defendant's proposed findings of fact as well as some additional proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.

Morris is an Alabama corporation located in Tallapoosa County, Alabama. Among other things, Morris manufactures and sells finished wood products. Morris is a 25 to 40 employee, family-run operation led by Rod and Wanda Morris. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1.)

Universal is one of almost a dozen subsidiaries of Universal Forest Products, Inc., ("UFP") a publicly traded company (NASDQ: UFPI). (DPFOF ¶ 34.) UPF is one of the nation's largest manufacturers of lumber and wood products and components. (DPFOF ¶ 35.) In 2005, UFP's sales exceeded $2.6 billion, which included over $1 billion in sales to the do-it-yourself ("DIY")/retail market. (DPFOF ¶ 36.) Morris' sales in 2005 were approximately $5.5 million, and it sold less than $1 million to DIY retailers. (DPFOF ¶ 37.)

In 2003, Morris entered into a licensing agreement with Keystone Exterior Design, LLC ("Keystone") to manufacture and sell a residential wood deck system that Keystone had designed.

2

(DPFOF ¶ 2.)  Keystone's Residential Deck System was designed to be pre-constructed so that consumers could assemble it without tools.  An 8' by 8' deck could be assembled in approximately one hour.  The Keystone system was customizable, and was made up of a variety of separate "kits" that could be purchased to add on to or vary the base kit "A".  (DPFOF ¶ 3.)

Morris' license agreement with Keystone, executed on November 1, 2003 stated: "This agreement is for the term from 11/1/2003 through 10/31/2004; thereafter the parties will review and renew the agreement annually, making revisions that are mutually agreeable."  (DPFOF ¶ 4; Morris Decl. 4, Ex. A.)  Morris' license agreement with Keystone further stated that "If licensor [Keystone] receives from a third party an offer to purchase its stock, [Morris] will have the first right of refusal in licensed markets and territories." (DPFOF ¶ 6; Morris Decl., Ex. A.).

In August 2003, Don Ludwig of Keystone and Rod Morris of Morris traveled to Eau Claire, Wisconsin to pitch the Keystone system to Menard, Inc. ("Menard") for resale in its stores.  (DPFOF ¶ 7.)  Dennis Scott ("Scott") was the Menard buyer and Morris' principal contact.  (DPFOF ¶ 8.)  By early 2004, Menard agreed to purchase the Keystone system products from Morris, conditioned on Morris' agreement to Menard's established vendor compliance program.  (DPFOF ¶ 9.)

Menard's vendor compliance program included a "no hassle" return policy (the "Return Policy").  Such policies are typical among "big box" retailers and DIY national chains.  (DPFOF ¶ 10.)

Menard considers such policies important to stay competitive with other big box retailers. Menard's Return Policy explains the competitive context from which such policies are born:

> We don't like the liberal return policies forced on us, but it is a trend in today's marketplace for consumers to expect retailers to take back purchases that do not meet their expectations for any reason or no reason.  We have to accept the customer's

3

return, no matter how inventive their excuse may be, in fear that the unhappy customer will never come back.

(DPFOF ¶ 11; Dep. Ex. 7 at 16.)

Procedurally, under Menard's Return Policy, in the next billing cycle after a return, the vendor designated for return items will be billed back via a debit memo itemizing the deduction for returns on the vendor's checks. (DPFOF ¶ 12.)

The Menard's Return Policy further provides that "[i]f you are a new vendor taking over an existing program, you will be automatically responsible for the old vendor's returns unless arrangements are made to the contrary." (DPFOF ¶ 13.)

Menard's Return Policy includes and incorporates Menard's Conditions of Order, which also appears on the back of each Menard's purchase order. Provisions of the Conditions of Order include in part:

E.　　All goods are to be new and first quality. **Vendor agrees to reimburse Menard for any return of the goods, whether by Menard or Menard's customers, for any reason.** The returned goods are billed back at Menard's store level or Menard's warranty center. Vendor agrees to accept Menard's account of how much credit is due. Vendor agrees that Menard does not need to have any customer return documents to verify its account. Vendor agrees not to require that the returns be brought back in its original package. * * * Vendor waives any right to inspect the goods prior to their disposition by Menard. Vendor shall be responsible for shipping, storage and handling charges. Menards does not guarantee the condition of the returns that are shipped back. * * * No return authorization numbers will be required for returning the goods or for any reimbursements to Menards. If Menard believes, in its sole discretion, that there is or will be excessive returns, Menard may establish a setoff in an amount equal to the amount that Menard believes will cover the return of the goods purchased hereunder, and withhold that amount from the amounts due the Vendor under the purchase order or any subsequent purchase order. Vendor understands that its obligation for the returns will last until all of the goods purchased are sold, plus a period of 12 months, or longer if Vendors warranty is longer.

F.　　**In consideration of becoming a Vendor for the line(s) of goods listed on the purchase order, you agree to compensate Menard in full for all goods**

4

**returned by customers, as outlined above, including any goods supplied by previous vendors for the line(s) of goods listed on the purchase order**.

. . .

I.     Vendor agrees that the terms and conditions hereunder and of the purchase order shall be interpreted and construed by the laws of the State of Wisconsin.

(DPFOF ¶ 14; Dep. Ex. 8.) (emphasis added)

Vendors' agreement to the Menard's Return Policy and Conditions of Order is non-negotiable.  (DPFOF ¶ 15.)

Morris began shipping Keystone kits, a seasonal product, to Menard in Spring 2004.  (DPFOF ¶ 16.)  In the first year of the agreement, Menard accounted for $1.5 million in sales of the Keystone kits.  (DPFOF ¶ 17.)

Menard deducted Morris for returns in an amount approximating $105,763.90 during the time Morris was the vendor.  (DPFOF ¶ 24; Pl.'s Resp. to DPFOF ¶ 24.)

In December of 2004, Keystone contacted Universal about selling Keystone to Universal.  (DPFOF ¶ 30; Pl.'s Resp. to DPFOF ¶ 30.)  A sale of Keystone to Universal was never consummated but Keystone and Universal entered into their own long-term licensing agreement in April 2005.  (DPFOF ¶ 32.)

Morris and Keystone worked out a short term license that enabled Morris to manufacture and sell $400,000 in additional Keystone Decking to Menard through April 30, 2005, while manufacturing was transitioning to Universal.  Morris so performed under an interim license that expired at the end of April.  (DPFOF ¶¶ 43, 46; Pl.'s Resp. to DPFOF ¶ 39.)

By April 2005, Universal was in discussions with Menard as the successor to the Keystone product line previously manufactured and sold by Morris.  Bryan Hoexum ("Hoexum") was a

5

principal sales representative for Universal during the negotiations with Universal. (DPFOF ¶ 48; Hoexum Dep. at 11-12.) Hoexum traveled to Eau Claire with Keystone's Don Ludwig to meet with Scott on April 15, 2005. (DPFOF ¶ 50.)

At that meeting and thereafter, Hoexum and Universal successfully negotiated several requested changes to Menard's vendor compliance agreement. (DPFOF ¶ 51; Hoexum Dep. at 66-70.) Universal could not cause Menard to strike or alter its Return Policy or Conditions of Order. (DPFOF ¶ 52.) The Return Policy and Conditions of Order signed by Universal were identical to those signed by Morris. (Pl.'s Resp. to DPFOF ¶ 38.)

Universal did not like the Menard's Return Policy. (DPFOF ¶ 53.) In an attempt by Universal to negotiate out the undesirable terms, Universal's authorized contract signatory Eric Maxey had submitted a signed vendor agreement that struck (a) the Return Policy's billing procedure language relating to new vendors' "automatic responsibility" for old vendors' returns, and (b) the Conditions of Order. (DPFOF ¶ 54; Hoexum Dep. at 70- 72; Dep. Ex. 41.) Menard's rejected this attempt. (DPFOF ¶ 54.) Hoexum tried to make the Return Policy negotiable. He specifically wanted to modify the assumption of old vendors' returns. Nevertheless, to Scott and Menard it remained non-negotiable. (DPFOF ¶ 55.)

Matthew Missad, UFP's Executive Vice President and Universal's Corporate Secretary testified that he always attempts to have this provision stricken, and is never successful. (DPFOF ¶ 56; Missad Dep. at 23-25.) Universal understood that if Universal wanted to do business with Menard, it would have to agree to the Return Policy and Conditions of Order in full, including the assumption of old vendors' returns. (DPFOF ¶ 56, 61.) The responsibility of a new vendor for the old vendor's returns appear in both the Return Policy and the Conditions of Order. (DPFOF ¶ 63.)

6

The parties dispute whether Menard has deviated from this policy in the past. (DPFOF ¶ 64; Pl.'s Resp. to DPFOF ¶ 64.) Universal contends that it has had past experience with the same Menard Purchase Order in which it has been the predecessor manufacturer and Menard has - despite the presence of a subsequent manufacturer that had signed the same Menard Purchase Order - debited Universal for returns of product that Universal had sold under a previous Menard Purchase Order. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 4; Missad Decl. ¶ 7.)

By May 6, 2005, Universal had signed a Menard's vendor agreement for the Keystone kits and was the vendor of record. (DPFOF ¶ 38.) Once Universal was the vendor of record, Menard tendered no returns to Morris. (DPFOF ¶ 66.) Morris admits that Universal has been debited for product Morris manufactured and for which Morris has been paid. (PPFOF ¶ 1.)

Hoexum claimed to have conducted a "due diligence" of the Keystone product then in Menard's inventory. Hoexum noted that Morris had utilized, in his opinion, a "different type of standard set." (DPFOF ¶ 57; Hoexum Dep. at 20-21.) Thus, prior to the time Universal signed off on the vendor compliance agreement, Universal suspected that Morris' products had quality issues. (DPFOF ¶ 58.)

Universal contends that Morris advised Universal, prior to the time Universal agreed to the standard Menard Purchase Order, that its Menard returns were 5% of sales, and that Universal relied on this return rate before executing the Menard Purchase Order for the manufacture and supply of the Keystone Decking. (PPFOF ¶ 3.) Morris contends that there is no evidence to support this conclusion. (Def.'s Resp. to PPFOF ¶ 3.)

Within a month of having executed the new vendor agreement, Universal was complaining to Menard about fielding customer calls related to kits purportedly manufactured by Morris (Scott

7

Dep. at 112-113). Consistent with Menard's policy, Scott's response was that it was Universal's responsibility now to keep the customer satisfied. (DPFOF ¶ 67; Dep. Ex. 12.)

Later that summer, one of Universal's in-house lawyers penned a letter to Menard's legal department. (Missad Dep. at 49; Dep. Ex. 13.) Universal invited Menard to debit Morris rather than deduct from Universal, and even volunteered to assist Menard in litigation against Morris. (DPFOF ¶ 68; Dep. Ex. 13.) Menard declined to alter its practice, and cited the Conditions of Order signed just months previously to remind Universal that it was to take responsibility for all returns. (DPFOF ¶ 69; Missad Dep. at 53-54; Dep. Ex. 30.) Despite this response from Menard's legal counsel, Universal continued to push for change through Menard's "business side." (DPFOF ¶ 70.)

On May 15, 2005, Morris filed suit against Keystone and Universal in Tallapoosa County Circuit Court. Morris asserts causes of actions for breach of contract, tortious interference and fraud related to its ouster as Keystone's licensee. (DPFOF ¶ 71; Morris Decl. ¶ 26, Ex. D.) Morris' Alabama action is expected to go to trial this year. (DPFOF ¶ 72.)

By February 2006, Universal had seen deductions for Keystone returns totaling approximately $63,000.00. (DPFOF ¶ 73.) In response to Universal's concerns, and as he had done in response to Morris' concerns, Scott advised Universal that he had implemented internal Menard's rules and guidelines within Menard to cut down on returns. He said the measures "should put a stop to all deck returns." (DPFOF ¶ 74; Scott Dep. at 123-124; Hoexum Dep. at 108-111; Dep. Ex. 15.) Universal claims that these measures had little, if any, impact. (DPFOF ¶ 76; Hoexum Dep. at 109-110.)

In February 2006, Universal submitted a proposed addendum to the parties' agreement to try (again) to change Menard's Return Policy. Once again, that request was summarily rejected. (DPFOF ¶ 77.)

8

In June 2006, and in response to more complaints from Universal, Scott suggested that Universal simply buy back Menard's inventory of older product. (Scott Dep. at 121-123; Hoexum Dep. at 134-135; Dep. Ex. 14.) More than a year after Menard's had last purchased product from Morris, it still claimed to have a substantial inventory, and did not know whose product it was. (DPFOF ¶ 80.)

Universal had expected the "turn" or turn-around for the kits (from Menard's purchase to consumer sale) to be only one quarter of a year. (DPFOF ¶ 81.) Menard admittedly purchased an excessive amount of product from Morris in an attempt to protect itself from uncertainty during the transition to Universal. (DPFOF ¶ 82.) The proposed buyback involved unsold inventory. (DPFOF ¶ 83.) This did not involve product that was somehow defective when first received by Menard from Morris more than a year prior. (DPFOF ¶ 84.)

The old inventory had sat in Menard's distribution centers and stores and "waned," becoming weathered, faded, and warped. (DPFOF ¶ 85.) Scott testified that a buyback in this situation would have been standard practice in the industry, and by buying back old inventory that had become unsaleable, Universal and Menard would be able to put it "behind us." (DPFOF ¶ 86; Scott Dep. at 158). In a letter dated August 24, 2006, Scott proposed specific terms of the buyback. (DPFOF ¶ 87; Dep. Ex. 19.)

Menard and Universal agreed to a buyback, substantially along the terms Scott proposed. (Scott Dep. at 135-136; Hoexum Dep. at 142-144.) The parties eventually agreed to a maximum buyback sum of $254,000.00. (DPFOF ¶ 90; Scott Dep. at 140-141; Dep. Ex. 23.) That maximum was nevertheless exceeded. The deductions related to the buyback total over $300,000.00. (DPFOF ¶ 91.)

9

There was no way for Universal to tell which Morris returns had been customer returned and which had not. Indeed, the "buyback" was effectuated exactly the same as other returns, namely, debits against Universal's billings. (PPFOF ¶ 16.) Accordingly, the buyback was an attempt by Universal to mitigate and minimize its damages by attempting place a cap on the amount of returns that Menard could make of Morris-manufactured Keystone Deck returns. (PPFOF ¶ 17.)

When the Keystone systems' manufacturing was transitioned to Universal, Menard did not alter the SKU numbers previously assigned to Morris-manufactured product. Accordingly, kits manufactured by Universal were assigned the same SKU numbers as kits manufactured earlier by Morris. (DPFOF ¶ 96.) Neither Menard's inventory system nor its deduction documentation differentiated products by manufacturer. The only way to differentiate between returns of Morris' kits and Universal's kits was to perform a visual inspection of each return. (DPFOF ¶ 97.) Universal claims to have conducted a kit-by-kit inspection of the returns, and has produced a summary of that inspection. (DPFOF ¶ 103.)

With its returns, Menard provided no documentation identifying a particular defect or reason for return. Under the terms of the Conditions of Order, Menard was not even required to specify a reason. (DPFOF ¶ 106.) The Menard policies cover more than defective returns; they cover returns for any reason. (DPFOF ¶ 107.)

Universal contends that since April 30, 2005, the total, aggregate amount of money that Menard has paid Universal for all of the kits it produced is $578,699.51 and it has debited over $604,000 in returns. According to Universal, it has therefore paid Menard more money than it has received during the 3 years it manufactured the Keystone Decking, because of the enormous volume

10

of Morris-manufactured returns. (PPFOF ¶ 2). Morris disputes this calculation. (Def.'s Resp. to PPFOF ¶ 2.)

Universal contends that it has received back from Menard much less than 5% of the Keystone Decks that it has sold to Menard. (PPFOF ¶ 5.) Morris disputes this figure. (Def.'s Resp. to PPFOF ¶ 5.)

Since 2007, the Keystone Deck sales at Menard have only been by special order, which means that there is no inventory on hand and a customer has to specially order the product at each Menard store and wait for Universal to specially manufacture and transport the product. Because of the weight of the product and the delay, this is the practical end of the Keystone Deck line at Menard. (PPFOF ¶ 19.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions,

11

answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

Morris moves for summary judgment on both counts of Universal's Amended Complaint. First, Morris argues that Universal cannot satisfy the prerequisites of its equitable subrogation claim because Universal is unable to show that Morris breached its contract with Menard, or that Universal is secondarily liable to Menard for returns. Second, Morris contends that Universal cannot satisfy any of the three elements of an unjust enrichment claim. Both of Universal's claims will be discussed in turn.

### A. Equitable Subrogation

Wisconsin recognizes the doctrine of equitable subrogation. Equitable subrogation "'rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer.'" *Pitts v. Revocable Trust of Knueppel*, 282 Wis. 2d 550, 566, 698 N.W.2d 761, 769 (Wis. 2005) (quoting *Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 541, 253 N.W.2d 512, 514 (Wis. 1977)). "A party who is subrogated to a second party's rights against a third party 'steps into the shoes' of the second party and may bring all claims which the second party could have brought against the third party." *Patients Compensation Fund v. Lutheran Hospital-LaCrosse*, 223 Wis. 2d 439, 451, 588 N.W.2d 35, 39 (Wis. 1999).

Subrogation "is applied when a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *American Ins. Co. v. City of Milwaukee*, 51 Wis. 2d 346, 351, 187 N.W.2d 142, 145 (Wis. 1971). "Subrogation is based on equity and is

13

permitted only when the rights of those seeking subrogation have greater equity than the rights of those who oppose it." *First Nat'l Bank v. Hansen*, 84 Wis. 2d 422, 429, 267 N.W.2d 367, 370 (Wis. 1978). "[T]he right of subrogation never follows an actual primary liability, and there can be no right of subrogation in one whose duty it is to pay, or in one claiming under him against one who is secondarily liable, or not liable at all." *Fitzgerald v. Buffalo County*, 264 Wis. 62, 63, 58 N.W.2d 457, 458 (Wis. 1953). However, because "'equity does not lend itself to the application of black letter rules,' subrogation 'depends upon a just resolution of a dispute under a particular set of facts.'" *Petta v. ABC Ins. Co.*, 278 Wis. 2d 251, 275, 692 N.W.2d 639, 651 (Wis. 2005) (quoting *Vogt v. Schroeder*, 129 Wis. 2d 3, 12, 383 N.W.2d 876, 879 (Wis. 1986)).

Morris argues that because it did not breach its contract with Menard, there can be no right to equitable subrogation. Morris contends that Universal has not explained how Morris breached its vendor agreement with Menard, and that Menard has never alleged that Morris breached its vendor agreement. Moreover, according to Morris, it has never failed to honor the Menard Return Policy.

In response, Universal argues that it is not necessary for Universal to establish that Morris breached its contract with Menard before Universal can subrogate to Menard's contractual rights. Moreover, Universal contends that even if breach of contract were a requirement for an equitable subrogation claim, Morris breached its contract with Menard by failing to reimburse Menard for Morris' returned goods.

As noted by Morris, the court in footnote 2 of its Decision and Order of November 30, 2006, stated that

> Universal included "Breach of Contract" in its title of Count I because equitable subrogation is to the contractual rights of another, and in this case Universal is attempting to pursue Menard's breach of contract claim against Morris. As a result,

14

> Universal must first establish that Morris breached its contract with Menard before it can subrogate to Menard's contractual rights.

(Nov. 30, 2007 Decision and Order at 5.)

In its Amended Complaint (as well as in its brief in opposition to Morris' motion to dismiss), Universal discusses the alleged breach of contract between Menard and Morris as the primary basis for Universal's equitable subrogation claim.[1] Specifically, Universal alleges that the Return Policy and Conditions of Order signed by Morris and Menard are legally binding agreements which conferred multiple rights and obligations. (Am. Compl. at ¶ 20.) Universal contends that Morris breached this understanding, in particular the Warranty, by manufacturing and delivering defective deck systems to Menard and by failing to reimburse Menard for the Morris Returns pursuant to the Warranty. (Am. Compl. at ¶ 21.) Universal further alleges in its Amended Complaint that as a result of this "breach of contract," Menard was damaged in excess of $75,000, and that Universal has been damaged concomitantly because it has reimbursed Menard for Menard's damages pursuant to the Guaranty and expects to continue to reimburse Menard for subsequent Morris Returns. (Am. Compl. at ¶ 22.)

Given that Universal asserted in its Amended Complaint that it was seeking to subrogate to the contractual rights of Menard by pursuing Menard's breach of contract claim against Morris, the

---

[1] In its brief in opposition to Morris' motion to dismiss, Universal argued:

The fact of the matter is that if equitable subrogation occurs, it is to the contractual rights of another—in this case Menard, so that Universal can then pursue that Menard's breach of contract claim against Morris. Thus, Universal seeks to subrogate to Menard's contractual rights under Paragraph E of its contract with Morris so that it can enforce the warranty claim. Universal is not suggesting that it can sue Morris directly for a breach of contract, because it has no contract with Morris.

(Pl.'s Br. in Opp. to Mot. to Dismiss at 9, n.3).

15

court noted that Universal could not pursue Menard's breach of contract claim against Morris unless Morris did, in fact, breach its contract with Menard. In doing so, however, the court was not necessarily stating that a breach of contract must always be established in order for a party to subrogate to the contractual rights of another.

Be that as it may, in its Amended Complaint Universal alleges that Morris had a contractual obligation to reimburse Menard for the Morris returns, and seeks to subrogate to Menard's right under the contract to seek reimbursement from Morris.[2] Although Universal characterized Morris' alleged failure to reimburse Menard as a breach of contract, whether this alleged failure constituted a breach of contract is not determinative of Universal's equitable subrogation claim. Rather, the determinative question is whether Universal, by reimbursing Menard for Morris' returns, paid a debt to Menard, other than as a mere volunteer, which in equity and good conscience should have been satisfied by Morris. *See American Ins. Co.*, 51 Wis. 2d at 351, 187 N.W.2d at 145. As noted above, equity is not decided by the application of black letter rules, and subrogation depends upon the just resolution of a dispute under a particular set of facts. *Petta*, 278 Wis. 2d at 275, 692 N.W.2d at 651.

Universal argues that equitable subrogation is appropriate in this case because Universal's obligation to Menard for the Morris returns was in the nature of an indemnity or third party guarantee, while Morris' obligation was in the nature of an underlying warranty or investment. Universal cites *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 360 N.W.2d 33 (Wis.

---

[2]Specifically, in its Amended Complaint, Universal alleges that because Universal has paid Menard for the Morris Returns, and Morris manufactured the defective product which was returned, agreed to be liable for the Morris Returns, and understood that Menard would look to compensation from the current vendor pursuant to the same "Guaranty" to which Morris had agreed, it is proper and equitable for Universal to subrogate to the rights under the PO which Morris signed, including but not limited to the "Warranty." (Am. Compl. at ¶ 19.)

16

1985) and *Employers Health Ins. v. General Casualty Co.*, 161 Wis. 2d 937, 958, 469 N.W.2d 172, 181 (Wis. 1991) to support its contention that the doctrine of equitable subrogation is applicable in such a situation. In *Cunningham*, the Wisconsin Supreme Court discussed the applicability of subrogation in the context of insurance contracts. 121 Wis. 2d at 444, 360 N.W.2d at 36. The court differentiated between contracts of indemnity and contracts of investment, and stated that insurers are allowed to receive subrogation for contracts of indemnity, but not for contracts of investment. *Id.* at 446, 360 N.W.2d at 37. In determining whether an insurance contract was one of indemnity or investment, the court found that it must first look at the insurance policy in question to determine the category in which the contract falls. *Id.* at 449, 360 N.W.2d at 39. Moreover, the court noted that it would be unwilling to find subrogation rights "in the absence of an express subrogation clause, and without the benefit of the policy in the record, that the insurer was subrogated to the extent of its payments made to the insured's rights to recover medical expenses from the third party tort-feasor." *Id.*

The court in *Cunningham* found that one rider was one of indemnity, and another rider was one of investment. In concluding that one rider was of indemnity, the court noted that the rider contained express language which provided unambiguous language regarding the indemnity nature of the contract.[3] *Id.* at 450, 360 N.W.2d at 39. Under this rider, the insurance company "expressly

_____

[3]Specifically, the rider at issue in *Cunningham* stated

If benefits have been paid hereunder on account of services received by the Employee or by a Dependent and thereafter it is established that the charges for such services were not paid by the Employee or the Dependent, or said Employee or Dependent was otherwise reimbursed therefor, the Insurance Company shall be entitled to a refund of the amount of the benefits paid which is in excess of the benefits that would have been payable based on the actual charges incurred and paid by the Employee or the Dependent.

17

contracted to receive a refund for reimbursements the insured received for medical expenses paid by [the insurance company]." *Id*. at 451, 360 N.W.2d at 40.

In concluding that the other rider was one of investment, the court found that the language in the rider was insufficient for the insurance company to meet "its burden to produce sufficient evidence to prove legal subrogation." *Id*. at 453, 360 N.W.2d at 40. The court noted that, unlike the other rider, this rider did not "specifically provide[] for reimbursement to the insurer for duplicative benefits paid for the insured's dependent." *Id*.

As an initial matter, the applicability of case law relating to insurance contracts to the case at hand is unclear. The doctrine of subrogation in the context of insurance contracts relates, at least in part, to issues specific to the relationship between policy holders and insurance companies.[4] A contract involving subsequent manufacturers and product returns is not completely analogous to an insurance contract, and cannot be analyzed in an identical manner.

However, regardless of the applicability of the indemnity/investment distinction to the case at hand, the key question that remains is whether Universal or Morris had primary liability for the Morris returns. As noted above, "the right of subrogation never follows an actual primary liability, and there can be no right of subrogation in one whose duty it is to pay, or in one claiming under him against one who is secondarily liable, or not liable at all." *Fitzgerald*, 264 Wis. at 63, 58 N.W.2d at 458. Moreover, "[w]here equities are equal, there are no subrogation rights." *Employers Health Ins.*,

_____

*Cunningam,* 121 Wis. 2d at 450-51, 360 N.W.2d at 39.

[4]As noted by the court in *Cunningham*, "[a]n additional purpose which underlies the doctrine of subrogation is that it prevents the policy holder from receiving more than he or she bargained for from the contract of insurance. . . Other proponents of the subrogation doctrine assert that it returns the excess, duplicative proceeds to the insurer who can then recycle them in the form of lower insurance premiums." 121 Wis. 2d at 445, 360 N.W.2d at 37

18

161 Wis. 2d at 958, 469 N.W.2d at 181 (Wis. 1991). Such being the case, in order for Universal to have the right of subrogation, Morris must be primarily liable for the Morris returns.

Universal's argument that its obligation was in the nature of an indemnity or third party guarantee is, in essence, an argument that its obligation was secondary to that of Morris. In determining whether Universal had a secondary obligation under its contract, it is unnecessary to label its contract as either an indemnity or investment contract based on the law governing insurance contracts.

In determining whether Universal was secondarily liable for the Morris returns, the court, as in *Cunningham*, must first look at the contract in question to determine liability for Universal and Morris. The specific provisions of the Menard Conditions of Order applicable to the case at hand are found in paragraphs E and F. Paragraph E states, in pertinent part: "Vendor agrees to reimburse Menard for any return of the goods, whether by Menard or Menard's customers, for any reason." (DPFOF ¶ 14; Dep. Ex. 8.) Paragraph F states: "In consideration of becoming a Vendor for the line(s) of goods listed on the purchase order, you agree to compensate Menard in full for all goods returned by customers, as outlined above, including any goods supplied by previous vendors for the line(s) of goods listed on the purchase order." *Id*.

Here, the provisions of the Conditions of Order indicate that Universal, as the current vendor, had primary liability for the Morris returns. The plain language of the Conditions of Order explicitly confers an obligation on the current vendor, and only the current vendor, to compensate Menard for all goods, including those supplied by previous vendors, such as Morris. There is no language referencing the obligations of past vendors, or the obligations of the current vendor if it is no longer

19

a vendor in the future.  Moreover, unlike the rider in *Cunningham*, there is no language referencing an entitlement to a refund or reimbursement.

Universal argues that it is secondarily liable for the Morris-manufactured returns because "Universal's obligation to compensate Menard for the Morris manufactured returns is found sequentially 'second,' in Paragraph F, after the Morris obligation in Paragraph 'E'" of the purchase order of the Conditions of Order.  (Pl.'s Br. in Opp. at 16.)  However, contrary to Universal's assertion, paragraph E of the Conditions of Order does not describe Morris' obligation.  Again, both paragraphs refer to the current vendor signing the Conditions of Order, and make no reference to past vendors.  As such, when Universal signed the Conditions of order, it was agreeing, as the "Vendor," to the terms of both paragraphs.  Likewise, when Morris signed the Menard Conditions of Order to become a vendor, paragraphs E and F both applied to Morris.

The undisputed circumstances surrounding Universal's signing of the Conditions of Order and becoming a vendor further support a finding that Universal is primarily liable for the Morris returns.  Universal made multiple attempts to negotiate out the Conditions of Order, specifically the assumption of old vendors' returns.  Menard rejected each attempt.  (DPFOF ¶¶ 55-56, 77.) Although Universal believed the return policy to be unfair, Universal understood that if it wanted to do business with Menard, it would have to agree to the Return Policy and Conditions of Order in full, including the assumption of old vendors' returns.  (DPFOF ¶ 56, 61.)  Universal's actions in trying to change the return policy indicate that it knew that, based on the contract, it would be debited for previous vendors' returns.

Moreover, Menard's actions in enforcing the Conditions of Order support a finding that Universal is primarily liable.  Once Universal was the vendor of record, Menard tendered no returns

to Morris. (DPFOF ¶ 66.) When Universal invited Menard to debit Morris instead, and even volunteered to assist Menard in litigation against Morris, Menard declined to alter its practice, and cited the Conditions of Order signed just months previously to remind Universal that it was to take responsibility for all returns. (Missad Dep. at 53-54; Dep. Ex. 30.) (DPFOF ¶ 69.)  Scott testified that, to his knowledge, Menard has never sought to deduct returns from the old vendor:

> Q:     I'm just asking you are you aware of there ever being an exception to this rule that Menard gets to deduct against the current vendor, where – where Menard is somehow responsible to go back after the old vendor for old returns?
>
> A:     Oh, no, I am not aware, no.
>
> Q:     Have you in your experience ever . . . pursued the old vendor for product returns despite having a new vendor?
>
> A:     I've never done that, no.

(Scott Dep. at 101.)

Universal also argues that its liability is secondary because Universal's liability was incurred second-in-time, after Morris had signed the Conditions of Order, and after Morris had been fully paid for the product that was eventually returned.   However, that Universal signed the Conditions of Order second-in-time does not make Universal's obligation secondary.   As noted above, the provisions of the Conditions of Order signed by Universal impose obligations on the current, second-in-time vendor, and do not describe obligations of the former vendor.  Moreover, as noted above, the actions of Universal and Menard indicate that both parties understood the Conditions of Order as imposing an obligation on Universal, the second-in-time vendor, to assume old vendors' returns. Menard, consistent with its policy, debited Universal for the prior vendor's returns.  Universal, believing this policy to be unfair, attempted to change the policy but ultimately agreed to accept the

21

terms in order to become the vendor. Universal's position as the current, second-in-time vendor supports, rather than refutes, a finding that it was primarily liable.

Universal further contends that there is nothing in the Conditions of Order signed by it and Morris that relieves the previous vendor of liability. Although this may be true, as noted above, the Conditions of Order *explicitly* imposes liability on the current vendor for returns of the previous vendor. There is no language in Conditions of Order indicating that the prior vendor retains primary liability for its returns once it is no longer the current vendor.

Universal also claims that it has had past experience with the same Menard Purchase Order in which it has been the predecessor manufacturer and Menard has, despite the presence of a subsequent manufacturer that had signed the same Menard Purchase Order, debited Universal for returns of product that Universal had sold under a previous Menard Purchase Order.[5] Even assuming Universal's contentions to be true, at best this indicates that Universal and Morris were equally liable for the Morris returns under the Conditions of Order, as Menard could pursue either Universal or Morris for reimbursement. However, as noted above, "[w]here equities are equal, there are no subrogation rights." *Employers Health Ins.,* 161 Wis. 2d at 958, 469 N.W.2d at 181. And again, it is undisputed that in the case at hand, Menard pursued only Universal for reimbursement for the Morris returns.

To be sure, Universal argues that equitable subrogation is appropriate because it is unfair for Universal to be liable for Morris' returns when Morris manufactured the goods and is holding payment for the goods. However, the mere fact that this situation may be unfair does not change the

---

[5]Universal has not provided any documentation from Universal or Menard to substantiate this claim outside of the Declaration by Matthew Missad.

22

terms of the Conditions of Order, or change how the parties understood those terms when Universal agreed to become the vendor. The relevant provisions of the Conditions of Order explicitly state that as a result of Universal's becoming a vendor it will be liable for Morris' manufactured goods, of which Morris would be holding the payment. Universal believed that this policy was unfair when it signed the Conditions of Order, but nevertheless accepted those terms.

It may be true that Universal did not envision the magnitude of returns that would occur after it became a vendor. Again, however, the magnitude of returns after the signing of the Conditions of Order does not change the meaning of the contract, or the parties' original understanding of the contract. The contract makes Universal primarily liable for Morris' returns, regardless of the magnitude of the returns. The contract does not reference magnitude of returns, and Menard has continued to enforce the provisions of the contract despite the high number of returns.

In sum, the plain terms of the Conditions of Order, Universal's acceptance of these arguably "unfair" terms despite its attempts to alter them, and Menard's consistent debiting of Universal for the returns, collectively demonstrate that Universal had primary liability for the Morris returns. Such being the case, Universal had a duty under the contract to reimburse Menard, and is unable to establish a right to subrogation.

**B. Unjust Enrichment**

"[A]n action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Watts v. Watts*, 137 Wis. 2d 506, 530, 405 N.2d 303, 313 (Wis. 1987). "[A] claim of unjust enrichment does not arise out of an agreement entered into by the parties." *Id*.

23

A plaintiff must allege and prove three elements to prevail on an unjust enrichment claim: "'(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof.'" *Seegers v. Sprague*, 70 Wis. 2d 997, 1004, 236 N.W.2d 227, 230 (Wis. 1975) (quoting *Don Ganser & Assocs, Inc. v. MHI, Inc.*, 31 Wis. 2d 212, 216-17, 142 N. W. 2d 781, 783 (Wis. 1966)).

Morris argues that Universal is unable to prove any of the three elements of an unjust enrichment claim. First, Morris contends that Universal did not confer a benefit on Morris. Specifically, Morris argues that, rather than confer a benefit on Morris, Universal ousted Morris from its position as the licensee of Keystone and the vendor to Menard. Moreover, Morris argues that Universal did not spare Morris the expense of accepting back defective product because there is no evidence that the Morris product was defective.

In response, Universal argues that Morris' arguments are nonsequiters, and that the only issue is whether Universal conferred a benefit on Morris by being debited over $500,000 for the Morris-manufactured returns. According to Universal, it is irrelevant whether Morris wanted Universal to replace it as the Keystone licensee and manufacturer. Furthermore, according to Universal, it is irrelevant whether the returns were for defective products, as Morris was liable for customer returns regardless of whether the product was shown to be defective.

Given the facts of this case, whether Universal can be said to have conferred a benefit on Morris is debatable. To be sure, Morris has benefitted in a sense from Menard's debiting of

24

Universal rather than Morris for the Morris-manufactured goods. Morris has been allowed to keep the revenue from the sale of its goods without having to reimburse Menard for its returned goods.

However, the receipt of this benefit came at a potential cost to Morris. Specifically, Universal was able to confer this benefit on Morris by replacing Morris as the Keystone licensee and manufacturer. The undisputed facts of the case indicate that Morris wanted to remain Keystone's licensee. Universal, while conferring a benefit on Morris by reimbursing Menard for the Morris returns, prevented Morris from continuing to reap the benefits of its account with Keystone and Menard. As such, it is unclear whether Morris has received a net benefit as a result of Universal's actions. Contrary to Universal's argument, the potential costs to Morris by Universal's actions are relevant to the issue of whether Universal conferred a benefit on Morris.

Even assuming that Universal conveyed a benefit on Morris by being debited by Menard, and even viewing the facts in the light most favorable to Universal, Universal is nevertheless unable to prove that the circumstances of this case would make it inequitable for Morris to retain this benefit.[6] The undisputed facts of this case establish that Universal voluntarily signed a contract with Menard, agreeing to assume liability for Morris-manufactured goods in exchange for replacing Morris as the Menard's vendor. Moreover, Universal has not presented any facts to indicate that the returns are

_____

[6]Assuming that Universal conveyed a benefit on Morris by being debited by Menard, it is possible that Universal can establish the second prong of an unjust enrichment claim, namely that Morris had an appreciation of the fact of the benefit. Although the parties dispute the extent of the reimbursement to which Universal is entitled, Universal has presented facts to indicate that Morris was aware, at least since the filing of the complaint, that Universal was being debited by Menard for Morris-manufactured returns, and that Universal was seeking to obtain reimbursement from Morris. Universal has also presented evidence that it is possible to calculate the exact damages attributable to the Morris returns.

25

due to Morris' manufacture of defective product, or that Morris intentionally induced Universal into signing the vendor agreement with Menard.

To be sure, Universal argues that the circumstances of this case are inequitable because Universal could not have reasonably expected that the Morris returns would be of such large magnitude when it entered into the contract. However, that unforeseen circumstances made the contract less lucrative for Universal than expected does not change Universal's obligations under the contract. The contract, by its plain terms, makes Universal liable for Morris' returns regardless of their magnitude. Menard continued to enforce these contract terms despite Universal's attempts to change the terms when it became apparent that the Morris returns were larger than expected.

Universal argues that there is no contract governing the relationship between Morris and Universal, and thus Universal is not barred from pursuing its unjust enrichment claim due to the existence of a contract with a third party, namely Menard. In this regard, Universal cites *Gebhardt Bros., Inc. v. Brimmel* in support of the proposition that Wisconsin law only bars claims for unjust enrichment where a contract covering the same subject matter in question exists to govern the relationship between the parties. 31 Wis.2d 581, 143 N.W.2d 479 (Wis. 1966).

Although it may be true that the existence of a contract between Universal and Menard does not bar Universal's claim for unjust enrichment, this does not mean that the contract is not relevant to a determination of the inequity of the circumstances, and whether it is appropriate for Morris to reimburse Universal. The contract may not govern the relationship between Universal and Menard, but it does establish Universal's obligations relating to the Morris returns. Again, the contract establishes that Universal, by reimbursing Menard, was merely fulfilling the terms of a contract it

26

voluntarily agreed to sign. Universal was aware of its obligations under the contract (and consequently tried to change these obligations), and Menard consistently enforced its terms.

Moreover, there is no evidence that Morris acted improperly such that the circumstances presented by this case are inequitable. There is no evidence that the excessive Morris returns were due to Morris' manufacture of defective product. Rather, much of the Morris returns for which Universal is seeking reimbursement is due to the negotiated buyback of unsold Morris (and Universal) product. Menard had purchased an excessive amount of product from Morris in an attempt to protect itself from uncertainty during the transition from Morris to Universal.

Furthermore, Morris did not intentionally induce Universal into agreeing to become a Menard vendor. To be sure, Universal contends that it relied on Morris' telling Universal that the Morris returns were averaging 5% of sales before Universal signed the Menard Purchase Order. And, although Universal may have relied upon this information in deciding to sign the Menard Purchase Order, there is no evidence that this information was in any way false or misleading.

Moreover, there is no evidence that Morris intended for Universal to use this information to decide to become a Menard vendor. Indeed, as noted above, Morris filed suit in Alabama against Universal for breach of contract, tortious interference, and fraud related to Morris' ouster as Keystone's licensee. Furthermore, Universal admits in its brief in opposition to the defendant's summary judgment motion, that "neither party remotely expected or could have reasonably anticipated that returns would end up being over 100% of the remaining Menard 'regular' purchases of Keystone decks." (Pl.'s Br. in Opp. at 3.) Both parties expected that Universal's decision to enter into a vendor agreement with Menard would result in profits for Universal.

27

In sum, there are no factual disputes which preclude resolution of Universal's unjust enrichment claim. It is undisputed that Universal, in exchange for becoming a Menard vendor, voluntarily agreed to accept the Morris returns under the terms of its contract with Menard. It is also undisputed that Menard consistently enforced the contract terms by debiting Universal for the Morris returns. Even assuming that Universal did not reasonably expect the returns to be of such magnitude, this does not relieve Universal of its duties under the contract. In light of all the foregoing, Universal is unable to prove the elements of its unjust enrichment claim.

## IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment will be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this 2nd day of June 2008, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

28